FILED
CLERK, U.S. DISTRICT COURT
DEC 9, 2004
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT
DEC 10 2004
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

Priority ✓
Send ✓
Enter ✓
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAREK MOLSKI, an individual; and DISABILITY RIGHTS ENFORCEMENT EDUCATION SERVICES: HELPING YOU HELP OTHERS, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>MANDARIN TOUCH RESTAURANT; EVERGREEN DYNASTY CORP., a California corporation; and BRIAN McINERNEY and KATHY S. McINERNEY, as joint tenants,<br><br>Defendants. | Case No. CV 04-0450 ER<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DECLARE JAREK MOLSKI A VEXATIOUS LITIGANT AND FOR A PRE-FILING ORDER REQUIRING MOLSKI TO OBTAIN LEAVE OF COURT BEFORE FILING ANY OTHER CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT** |

Defendant Evergreen Dynasty Corporation, doing business as Mandarin Touch Restaurant,[1] has asked this Court to declare Plaintiff Jarek Molski a vexatious litigant, and to order Molski to obtain leave of court

---

[1] Brian and Kathy S. McInerney did not join in the Motion for a Pre-Filing Order. For simplicity, this order will refer to Mandarin Touch and Evergreen Dynasty, collectively, as "Defendant."

32

before filing any other claims under the Americans With Disabilities Act. The matter came on for hearing on November 15, 2004, the Honorable Edward Rafeedie presiding. The Court has concluded that a pre-filing order is appropriate for the reasons discussed below.

**Statement of Facts**

a. <u>Plaintiff's History of Litigation</u>

Plaintiff Jarek Molski is a physically disabled individual who relies on a wheelchair for ambulation. Although he resides in Woodland Hills, he has filed hundreds[2] of lawsuits in federal courts throughout the state of California.

A review of the cases submitted to this Court reveals that many are nearly identical in terms of the facts alleged, the claims presented, and the damages requested. In virtually every complaint involving a restaurant or winery, Molski initially reports having trouble finding adequate van-accessible parking. Then, almost uniformly, he reports difficulties entering the business, often citing ramps that are too steep, or doors that require more pressure to open than is

---

[2] Defendant's Memorandum of Points and Authorities asserts that Molski has filed 334 lawsuits in the federal courts since 1998. During the hearing, Plaintiff's counsel stated that Molski had filed approximately 400 suits, and the Court will accept that number. Despite this considerable number of filings, Molski has never litigated a suit on the merits in the Central District of California. The vast majority of his claims settle, with a significant minority dismissed for lack of prosecution or violation of a court order.

-2-

permitted by law. After entering the business, Molski generally complains that the service counter is too high. Virtually every complaint ends with Molski venturing to the restroom, which inevitably suffers from at least one violation. Molski almost always suffers some injury - typically to the upper extremities - in the process of transferring himself from his wheelchair to the toilet. He also regularly complains of suffering humiliation or other emotional distress from the experience. Molski's prayer for relief routinely includes both a request for injunctive relief and damages of $4,000 per day, for each day after his visit until the facility is brought up to ADA standards.

The facts of the instant case are predictably similar. On January 25, 2003, Molski's complaint alleges that he had dinner at the Mandarin Touch Restaurant in Solvang, California. After dinner, Molski attempted to use the restroom, but found that the entrance was too narrow. Molski then alleges that, as he was attempting to leave the restroom, his hand became "caught in the exterior door causing trauma to it." The lawsuit asks for injunctive relief to bring the restaurant up to ADA standards, and damages of not less than $4,000 per day, for each day after his visit until such time as the restaurant is made fully accessible.

b. <u>The Americans With Disabilities Act</u>

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, <u>et</u> <u>seq.</u>, was signed into law in 1990. Its stated goal is to remedy discrimination against individuals with disabilities.[3] To that end, Title III of the ADA, 42 U.S.C. § 12181, <u>et</u> <u>seq.</u>, requires the removal of structural barriers in existing public accommodations "where such removal is readily achievable."[4] 42 U.S.C. § 12182(b)(2)(A)(iv). <u>See also</u> 28 C.F.R. § 36.304 (2004)(listing examples of, and prioritizing, readily achievable repairs). Where removal of the barrier is not readily achievable, the facility must provide access "through alternative

---

[3] The ADA states:
It is the purpose of this Act--
  (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
  (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
  (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this Act on behalf of individuals with disabilities; and
  (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.
42 U.S.C. § 12101(b).

[4] The ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9).

-4-

1  methods if such methods are readily achievable." 42
2  U.S.C. § 12182(b)(2)(A)(v).
3      To enforce Title III, the ADA contains both a
4  private right of action, 42 U.S.C. § 12188(a), and a
5  right of action for the Attorney General, 42 U.S.C. §
6  12188(b). While the Attorney General may seek monetary
7  damages on behalf of an aggrieved party, 42 U.S.C. §
8  12188(b)(2)(B), the only remedies available under the
9  private right of action are injunctive relief and the
10 recovery of attorneys' fees and costs. 42 U.S.C. §
11 12188(a)(1); 42 U.S.C. § 2000a-3(a). By providing
12 different remedies for public and private enforcement,
13 Congress clearly demonstrated its intent to prevent
14 private plaintiffs from recovering money damages under
15 the ADA. <u>American Bus Ass'n v. Slater</u>, 231 F.3d 1, 5
16 (D.C. Cir. 2000) ("By specifying the circumstances
17 under which monetary relief will be available, Congress
18 evinced its intent that damages would be available in
19 no others.").
20     However, enterprising plaintiffs (and their
21 attorneys) have found a way to circumvent the will of
22 Congress by seeking money damages while retaining
23 federal jurisdiction. Because a violation of the ADA
24 also constitutes a violation of California's Unruh
25 Civil Rights Act, Cal. Civ. Code § 51(f), and the
26 California Disabled Persons Act ("CDPA"), Cal. Civ.
27 Code § 54(c), Plaintiffs can sue in federal court for
28 injunctive relief under the ADA, and tack on state law

claims for money damages under the Unruh Act and CDPA. See, e.g., Moeller v. Taco Bell Corp., 220 F.R.D. 604, 607 (N.D. Cal. 2004).

The ability to profit from ADA litigation has given birth to what one Court described as "a cottage industry." Rodriguez v. Investco, L.L.C., 305 F. Supp. 2d 1278, 1280-81 (M.D. Fla. 2004). The scheme is simple: an unscrupulous law firm sends a disabled individual to as many businesses as possible, in order to have him aggressively seek out any and all violations of the ADA. Then, rather than simply informing a business of the violations, and attempting to remedy the matter through "conciliation and voluntary compliance," id. at 1281, a lawsuit is filed, requesting damage awards that would put many of the targeted establishments out of business. Faced with the specter of costly litigation and a potentially fatal judgment against them, most businesses quickly settle the matter.

The result of this scheme is that "the means for enforcing the ADA (attorney's fees) have become more important and desirable than the end (accessibility for disabled individuals)." Brother v. Tiger Partner, LLC, 331 F. Supp. 2d 1368, 1375 (M.D. Fla. 2004). Serial plaintiffs, like Molski, serve as "professional pawn[s] in an ongoing scheme to bilk attorney's fees." Rodriguez, 305 F. Supp. 2d at 1285. It is a "type of shotgun litigation [that] undermines both the spirit

and purpose of the ADA." <u>Brother</u>, 331 F. Supp. 2d at 1375.[5]

**Analysis**

a. <u>Authority to Issue Pre-Filing Order</u>

The District Court has the inherent power to levy sanctions in response to abusive litigation practices. <u>See</u>, <u>e.g.</u>, <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 765-66 (1980). This inherent power is augmented by Local Rule 83-8, which empowers this Court to craft an appropriate sanction to defend against vexatious litigation, including, but not limited to, "a directive to the Clerk not to accept further filings from the litigant without payment of normal filing fees and/or without written authorization from a judge of the Court or a Magistrate Judge, issued upon such showing of the evidence supporting the claim as the judge may require."[6] C.D. Cal. Local Rule 83-8.2.

---

[5] The <u>Brother</u> court expressed serious concerns about the "vexatious litigation tactics" employed by serial ADA plaintiffs, and called upon the Congress to formulate a legislative solution to the problem. 331 F. Supp. 2d at 1375. Pending legislative reform, however, "[t]he appropriate mechanism for addressing allegations of such behavior lies with the ethics and disciplinary bodies of State bar associations or with the court where the litigation is pending." <u>ADA Notification Act: Hearings on H.R. 3590, before the Subcomm. on the Constitution of the House Comm. on the Judiciary</u> (May 18, 2000), <u>available</u> at: http://commdocs.house.gov/committees/judiciary/hju66728.000/hju66728_0.htm.

[6] Local Rule 83-8 also states:
It is the policy of the Court to discourage vexatious litigation and to provide persons who are subjected to vexatious litigation with security

b. <u>Standard for Vexatious Litigant</u>

In deciding whether or not to restrict a litigant's access to the courts, "[u]ltimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." <u>Safir v. United States Lines, Inc.</u>, 792 F.2d 19, 23 (2nd Cir. 1986). In doing so, the Court should look to five factors: (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties. <u>See id.</u>

1. <u>Litigant's History of Litigation</u>

A "vexatious suit" is a "lawsuit instituted

---

against the costs of defending against such litigation and appropriate orders to control such litigation. It is the intent of this rule to augment the inherent power of the Court to control vexatious litigation and nothing in this rule shall be construed to limit the Court's inherent power in that regard.
C.D. Cal. Local Rule 83-8.1.

-8-

maliciously and without good cause." Black's Law Dictionary 1596 (8th ed. 2004). After examining Plaintiff's extensive collection of lawsuits, the Court believes that most, if not all, were filed as part of a scheme of systematic extortion, designed to harass and intimidate business owners into agreeing to cash settlements.

The Court bases this determination on several considerations. One is the sheer volume of lawsuits filed by this Plaintiff. Although litigiousness alone is insufficient to justify a restriction on filing activities, see In re Oliver, 682 F.2d 443, 446 (3rd Cir. 1982), it is a factor the Court considers indicative of an intent to harass. See De Long v. Hennessey, 912 F.2d 1144, 1147 (9th Cir. 1990) (stating that in order to issue a prefiling order, "[a]t the least, the record needs to show, in some manner, that the litigant's activities were numerous or abusive"). Here, Molski's filing are plainly numerous, and, as discussed throughout this order, abusive as well.

Another consideration is the textual and factual similarity of the complaints filed by Plaintiff. This too, while not dispositive, is a factor the Court considers indicative of an intent to harass, as it suggests that Plaintiff is filing boilerplate complaints. See In re Powell, 851 F.2d 427, 431 (D.C. Cir. 1988) (stating that "the district court should attempt to discern whether the filing of several

-9-

similar types of actions constitutes an intent to harass the defendant or the court").

Most important, however, is the Court's conclusion that the allegations contained in Plaintiff's complaints are contrived and not credible. Although it is not obvious when looking at an individual complaint, examining Plaintiff's complaints in the aggregate reveals a clear intent to harass businesses.

For example, in <u>Molski v. El 7 Mares Restaurant</u>, Case No. C04-1882 (N.D. Cal. 2004), Molski claims that, on May 20, 2003, he and significant other, Brygida Molski, attended the El 7 Mares Restaurant for the purposes of dining out. Molski alleges that the restaurant lacked adequate handicapped parking, and that the food counter was too high. After the meal, Molski attempted to use the restroom, but because the toilet's grab bars were improperly installed, he injured his shoulders in the process of transferring himself from his wheelchair to the toilet. Thereafter, he was unable to wash his hands because of the lavatory's design.

Although this complaint appears credible standing alone, its validity is undermined when viewed alongside Molski's other complaints. In <u>Molski v. Casa De Fruta</u>, L.P., Case No. C04-1981 (N.D. Cal. 2004), Molski alleges that he sustained nearly identical injuries on the exact same day, May 20, 2003. In <u>Casa de Fruta</u>, Molski alleges that he and significant other, Brygida

-10-

Molski, patronized Casa de Fruta for the purpose of wine tasting. On arrival, Molski was again unable to locate van accessible parking. Once inside, Molski again found the counter to be too high. After wine tasting, Molski again decided to use the restroom, and again, injured his upper extremities while in the process of transferring himself to the toilet. Thereafter, he was once again unable to wash his hands due to the design of the lavatory.

This was, apparently, not the end of Molski's day. In <u>Molski v. Rapazzini Winery</u>, Case No. C04-1881 (N.D. Cal. 2004), Molski once again alleges that he sustained nearly identical injuries on the exact same day, May 20, 2003. Molski, again accompanied by Brygida Molski, claims he visited the Rapazzini Winery for the purpose of wine tasting. Again, Molski complains that the parking lot lacked adequate handicapped van accessible parking. Upon entering the establishment, he discovered that the counter was too high. After tasting wine, he again needed to use the restroom. In the course of transferring himself from his wheelchair to the toilet, he injured himself yet again. Thereafter, he was again unable to wash his hands due to the lavatory's design.

The Court is tempted to exclaim: "what a lousy day!" It would be highly unusual - to say the least - for anyone to sustain two injuries, let alone three, in a single day, each of which necessitated a separate

federal lawsuit. But in Molski's case, May 20, 2003, was simply business as usual. Molski filed 13 separate complaints for essentially identical injuries sustained between May 19, 2003 and May 23, 2003. The Court simply does not believe that Molski suffered 13 nearly identical injuries, generally to the same part of his body, in the course of performing the same activity, over a five-day period. This is to say nothing of the hundreds of other lawsuits Molski has filed over the last four years, many of which make nearly identical allegations. The record before this Court leads it to conclude that these suits were filed maliciously, in order to extort a cash settlement.

It is possible, even likely, that many of the businesses sued were not in full compliance with the ADA. However, "[f]or purposes of imposing sanctions under the inherent power of the court, a finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of [sanctions].'" Fink v. Gomez, 239 F.3d 989, 992 (9th Cir. 2001)(citations omitted). See also Vollmer v. Selden, 350 F.3d 656, 660 (7th Cir. 2003) (a non-frivolous filing may be sanctionable if filed for an improper purpose, such as extortion). So, even if the businesses sued by Molski were in violation of the ADA,

-12-

this fact is outweighed by the Court's finding that he acted in bad faith, for the improper purpose of extorting a settlement. The Court therefore finds that Molski has a considerable history of vexatious litigation. See Brother, 331 F. Supp. 2d at 1375 (describing a similar pattern of "shotgun" ADA litigation, designed to extort attorneys' fees, as "vexatious litigation").

### 2. Litigant's Motive

The next factor to be considered is the litigant's motive in bringing the lawsuit. Molski claims that his motivation was to obtain injunctive relief, and that the funds recovered were largely used to offset his legal expenses. But this explanation is undercut by his course of action. The ADA itself allows private plaintiffs to sue for injunctive relief, and to recover their attorneys' fees and costs. It does not allow for any award of money damages to a private plaintiff. If Molski's motivation was genuinely to obtain injunctive relief and recover his legal costs, he could sue entirely under the ADA. But he does not do that. Instead, Molski almost always raises additional state law claims under the CDPA, California Health & Safety Code, the Unruh Civil Rights Act, and California Bus. & Prof. Code § 17200, which allow for the recovery of money damages.

Clearly, raising multiple claims, by itself, is not unethical or vexatious. However, it is consistent with

an overall pattern of behavior that demonstrates Molski's motivation is, ultimately, to extract a cash settlement. The threat of significant money damages[7] is a much more effective inducement to settle than merely requesting a court order to make "readily achievable" repairs. And that threat appears to be working. Almost as startling as the sheer number of complaints Molski has filed, is the number of those claims that settle. Of the hundreds of cases Molski has filed in this district, not one has ever been litigated on the merits. The overwhelming majority settle, with a significant minority dismissed for violation of a court order, or failure to prosecute the claim. This not only calls into question Molski's good faith expectation of prevailing on the merits of his claim, but also suggests that he does not even have a reasonable expectation (or intention) of litigating the suit on the merits.[8] Molski's m.o. is clear: sue, settle, and move on to the next suit.

---

[7] And the damages requested are quite significant. Molski routinely asks for $4,000 per day, for every day from his visit until the repairs are completed. And Molski often waits a year or more before filing suit. In the instant case, the purported violation took place on January 25, 2003, but the suit was not filed until January 23, 2004. That delay alone would be worth $1,452,000 if Molski received the damages requested.

[8] Additionally, given Molski's considerable history of making questionable claims, a jury could reasonably refuse to credit his testimony. This further weakens the likelihood of Molski prevailing on the merits of his claims.

-14-

### 3. Representation By Counsel

The next factor is whether or not Molski is represented by counsel. Molski has been represented by counsel in every lawsuit that this Court is aware of. Although courts are generally protective of pro se litigants, this same protection does not apply to litigants represented by counsel, and thus, this factor also weighs against Plaintiff. See Iwachiw v. N.Y. City Bd. of Elections, 273 F. Supp. 2d 224, 228 (E.D. N.Y. 2003).

### 4. Burden on the Courts

The fourth factor is whether Plaintiff has caused needless expense to other parties or unnecessarily burdened the courts. Because Plaintiff has filed a countless number of vexatious claims, the Court believes this factor plainly weighs against him.

### 5. Adequacy of Other Sanctions

The final factor is whether sanctions, other than a pre-filing order, could adequately protect the court and other parties. For the reasons already discussed, the Court believes the answer is no. As noted above, Plaintiff's filings appear meritorious when examined individually. Their vexatious nature is revealed only when viewed in the aggregate. Thus, the only effective way to put a reviewing judge on notice of Plaintiff's history is to require Molski to file a copy of this order with every new complaint that he seeks to file. This would allow the reviewing judge to assess whether

Molski had raised a bona fide claim of discrimination under the ADA, or whether he was merely bringing another vexatious claim in order to strong arm a business into settling. See, e.g., In re Billy Roy Tyler, 839 F.2d 1290, 1293-94 (8th Cir. 1988) (per curiam) (holding that a pre-filing order is appropriate where petitioner was able to consistently dress up frivolous claims so that, on the face of the complaint, they appeared to be meritorious).

**Conclusions**

The Court is convinced that a pre-filing order is justified and necessary to prevent Molski from filing any further vexatious complaints. The Court has no doubt that Molski's "shotgun litigation" tactics "undermine[] both the spirit and purpose of the ADA." In addition to misusing a noble law, Molski has plainly lied in his filings to this Court. His claims of being the innocent victim of hundreds of physical and emotional injuries over the last four years defy belief and common sense.

But Molski has not acted alone. In every action, Molski is aided and abetted by his attorneys, often the Thomas E. Frankovich Law Offices, and his corporate co-Plaintiff, Disability Rights Enforcement Education Services: Helping You Help Others ("DREES").[9] For that

---

[9] The Court notes that it has at least one other case currently before it involving DREES and the Frankovich firm. The named plaintiff in that case is Les Jankey. Jankey v. Yang Chow

-16-

reason, this Court is also issuing orders to show cause why the Court should not exercise its inherent power to extend similar sanctions to them, for their role in facilitating Molski's abusive litigation practices.[10]

The Court is also troubled by the fact that Molski raises a federal ADA claim in the federal courts, while seeking a remedy, money damages, exclusively available under state law.[11] Even if proven, the ADA claim would not entitle Molski to any relief that is not already available under state law. Additionally, the burden of proving an ADA claim is necessarily at least as high as proving a violation to the California statutes, as a violation of the ADA constitutes a prima facie violation of those statutes. Thus, the ADA claims do not extend Molski any benefit in terms of the litigation itself, or the remedies he may seek, other than allowing him to proceed in the federal courts.

For that reason, the Court believes that Molski's ADA claims are a sham, used as a pretext to gain access to the federal courts, while he pursues remedies that

---

Restaurant, CV 03-2239 (C.D. Cal. 2003). While less prolific than Molski, the Court's computer docketing program reveals that Jankey has filed 36 claims in the Central District, including 21 cases filed in 2004 alone. In each of these cases, Jankey was represented by the Frankovich firm, and DREES is a co-plaintiff.

[10] The Court will also issue an order to show cause why DREES's claims should not be dismissed for a lack of standing.

[11] Although Molski does seek injunctive relief and attorneys' fees under the ADA, he also requests them as part of his state law claims.

are available - sometimes exclusively - under California state law. Therefore, the Court will also issue an order to show cause why Molski's ADA complaint should not be dismissed, and his remaining claims remanded back to state court, for lack of subject matter jurisdiction.

Sadly, Molski is not unique. The Trevor Law Group, and others like it, have achieved infamy in California for carrying out a similar scheme under California's Unfair Business Practices statute, Bus. & Prof. Code § 17200 et seq. As one Court described it:

> The abuse is a kind of legal shakedown scheme: Attorneys form a front "watchdog" or "consumer" organization. They scour public records on the Internet for what are often ridiculously minor violations of some regulation or law by a small business, and sue that business in the name of the front organization. Since even frivolous lawsuits can have economic nuisance value, the attorneys then contact the business (often owned by immigrants for whom English is a second language), and point out that a quick settlement (usually around a few thousand dollars) would be in the business's long-term interest.
> People ex rel. Lockyer v. Brar, 115 Cal. App. 4th 1315, 1316-17 (2004).

These words could apply, almost verbatim, to the scheme perpetrated by Molski, DREES, and the Frankovich firm. And this Court is not unmindful of the result of the Trevor Law Group's abuse of the Unfair Business Practices statute. In the most recent election, the citizens of California overwhelmingly backed Proposition 64, which greatly limited the private attorney general provision of that law. It is not

beyond the realm of belief that the actions of Molski, and those like him, pose a similar threat to the ADA.

Thus, this pre-filing order serves as a bulwark that not only shields the Court and defendants from vexatious litigation, but also protects the "purpose and spirit of the ADA." It does not limit the right of a legitimately aggrieved disabled individual to seek legal relief under the ADA; it only prevents abuse of that law by professional plaintiffs, like Molski, and their lawyers, such as the Frankovich firm, whose priority is their own financial gain, and not "the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

For all of these reasons, the Court finds that Jarek Molski is a vexatious litigant. Before filing any new litigation alleging violations of Title III of the ADA in the United States District Court for the Central District of California, Molski is hereby ordered to file a motion for leave to file a complaint. Molski must submit a copy of this order and a copy of the proposed filing with every motion for leave. This will allow a reviewing judge to assess whether the proposed filing is made in good faith, or is simply another attempt to extort a settlement.

**Rule 11 Sanctions**

Defendant has also requested sanctions under Rule 11. At this point, the Court has not made any formal determination regarding the merits of the instant case,

1  and as such, Rule 11 sanctions would be premature. The
2  request for sanctions is therefore DENIED.

5  IT IS SO ORDERED.
6  IT IS FURTHER ORDERED that the Clerk of the Court shall
7  serve, by United States mail or by telefax or by email,
8  copies of this Order on counsel for the parties in this
9  matter.

10  Dated:   DEC - 9 2004

*Edward Rafeedie*

EDWARD RAFEEDIE
Senior United States District Judge