# Exhibit

# B



FILED
CLERK, U.S. DISTRICT COURT
MAR - 8 2005
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY
ENTERED
CLERK, U.S. DISTRICT COURT
MAR - 8 2005
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY
Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAREK MOLSKI, et al., Plaintiffs, v. MANDARIN TOUCH RESTAURANT, et al., Defendants. | Case Nos. CV 04-450 ER and CV 03-2239 ER |
| LES JANKEY, et al., Plaintiffs, v. YANG CHOW RESTAURANT PASADENA, et al., Defendants. | MEMORANDUM DECISION RE ORDERS TO SHOW CAUSE |

On December 9, 2004, this Court issued an order declaring Jarek Molski a vexatious litigant and requiring him to obtain leave of court before filing any further ADA claims in the district court. 347 F.

EXHIBIT B

Supp. 2d 860 (C.D. Cal. 2004). That order and its findings with regard to Plaintiff Molski are incorporated by reference as though fully set forth. As a result of the Court's factual investigation relating to that order, the Court issued additional orders to show cause to the Plaintiffs and attorneys in that case, as well as the Plaintiffs and attorneys in the case of Jankey v. Yang Chow Restaurant. Specifically, the Court ordered Disability Rights Enforcement Education Services: Helping You Help Others ("DREES"), a co-plaintiff in both cases, and The Frankovich Group, attorneys of record for the Plaintiffs in both cases, to show cause why the Court should not require them to seek leave of court before filing a complaint alleging violations of the Americans with Disabilities Act ("ADA"). Further, the Court ordered DREES to show cause why its complaints should not be dismissed for a lack of standing. Finally, the Court ordered the Plaintiffs to show cause why the Court should not dismiss their suits for lack of subject matter jurisdiction.[1]

[1] A hearing was held on these Orders to Show Cause on February 7, 2005, the Honorable Edward Rafeedie, presiding. At that hearing, the Court announced its tentative ruling, including the findings of fact and conclusions of law that form the basis of this order. Despite requesting (and receiving) a continuance, purportedly to allow counsel time to prepare for that hearing, the Plaintiffs did not challenge any of the Courts tentative findings or conclusions, and did not present any oral argument.

After an extensive review of The Frankovich Group's litigation practices, the Court believes it must exercise its inherent power to protect the judicial system and the public from the abusive and predatory litigation practiced by the respondents. Accordingly, the Court HEREBY ORDERS that The Frankovich Group, as presently constituted, and as it may hereafter be constituted, including shareholders, associates and employees, is required to file a motion requesting leave of court before filing any new complaints alleging violations of Title III of the Americans with Disabilities Act in the United States District Court for the Central District of California. Such a motion must include a copy of this order. By prior orders, the Court has also dismissed Plaintiff DREES's federal ADA claims for lack of standing, and has dismissed the four state law causes of action in these cases because the Court declines to exercise supplemental jurisdiction over these claims under 28 U.S.C. § 1367 (c) (1) and (2). The Court's reasons are fully set forth herein.

I. Facts

Plaintiff Jarek Molski is a wheelchair bound paraplegic. Since 1998, he has filed more than 400 federal lawsuits alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., the vast majority of which were filed since 2001.

Plaintiff Les Jankey suffers from an unknown congenital birth defect that deprived him of the use of his legs. He relies on a wheelchair for mobility. Jankey has filed 36 federal lawsuits alleging violations of the ADA, 21 of which were filed in 2004. Plaintiff DREES is a 501(c)(3) corporation, whose stated goal is to empower persons with disabilities to be independent in America. Thomas E. Frankovich, a Professional Law Corporation dba The Frankovich Group is counsel of record in both cases.

In 2004, The Frankovich Group filed at least 223 lawsuits in the United States District Courts for the Northern and Central Districts of California, of which approximately one-third targeted ethnic restaurants - Asian and Mexican - perhaps because such establishments are seen as easy prey for coercive claims.[2] Of those lawsuits, 156 (or 70%) were filed on behalf of Jarek Molski. Another 40 lawsuits (or 18%) were filed on behalf of either Les Jankey or Patrick Connally, the President of DREES and himself a serial plaintiff, having filed 19 suits in 2004. DREES appeared as a co-plaintiff in each of the 223 suits.

The 223 separate complaints are almost identical. Each of the 223 complaints alleges the same five causes

---

[2] The Court has obtained and read the 223 complaints that it that it was able to recover. A handful of complaints filed in the Northern and Central Districts were unavailable for various reasons. The Court also identified, but was unable to obtain, at least 11 complaints filed in the Eastern District.

SCANNED

of action: a federal ADA claim, and the same four claims under California state law.[3] The damages requested are also identical. Indeed, other than superficial alteration of the facts and names, the complaints are textually identical, often down to the typos.

A prominent common thread among the complaints is the allegation of physical injuries. In each and every complaint, Frankovich Group clients claim to suffer a bodily injury as a result of encountering an architectural barrier. Sometimes the claim of bodily injury is general, but more often, it is specific. For example, in 178 of the 223 cases, or 80% of the cases, the plaintiff claims an injury to his or her upper extremities. In 33 of the 223 cases, or 15% of the cases, the plaintiff claims to have scraped his or her hand or knuckles, generally when passing through a door which was too narrow.

It is also common for Frankovich Group clients to make multiple claims for injuries purportedly sustained on the same day. In the Court's Order Declaring Jarek Molski a Vexatious Litigant, it recounted the events of May 20, 2003. 347 F. Supp. 2d at 864-65. That day,

[3] Those claims are 1) Violation of California Civil Code §54, et seq., The California Disabled Persons Act ("CDPA"); 2) Violation of California Health & Safety Code § 19955, et seq., Denial of Accessible Sanitary Facilities; 3) Violation of California Civil Code § 51, et seq., The Unruh Civil Rights Act; and 4) Violation of California Business & Professions Code § 17200, et seq., Unfair Business Practices.

Molski made nearly identical claims of injury at three separate businesses. Now, after a review of all 223 complaints, the Court is in a position to supplement that record.

The following day, May 21, 2003, Molski claims to have been injured at four separate businesses. In Molski v. Longhouse Restaurant, C04-1492 (N.D. Cal. 2004), Molski alleges he injured his upper extremities trying to transfer himself onto a toilet at the Longhouse Restaurant in Gilroy. In Molski v. King & I Investment Group, C04-1493 (N.D. Cal. 2004), he claims to have injured his upper extremities ascending steps at the King & I Thai Cuisine restaurant in Morgan Hill. In Molski v. Morgan Hill 76, C04-1945 (N.D. Cal. 2004), he claims to have injured his upper extremities going over a step at the Morgan Hill 76 gas station. Finally, in Molski v. La Rochelle, C04-1985 (N.D. Cal. 2004), Molski alleges he scraped his hands when he became wedged in the bathroom door at the La Rochelle winery in San Jose.

The day after that, May 22, 2003, Molski again claims that he was injured at four separate business establishments. In Molski v. Pump N Go, C04-1854 (N.D. Cal. 2004), Molski claims to have injured his upper extremities transferring himself to the toilet at the Pump N Go gas station in Morgan Hill. In Molski v. The Cove, C04-1880 (N.D. Cal. 2004), he claims to have injured his upper extremities when he tried to transfer

himself onto a toilet that had only one grab bar at The Cove restaurant in Gilroy. In Molski v. Casa Medina, C04-1947 (N.D. Cal. 2004), Molski claims to have injured himself while negotiating architectural barriers at the Casa Medina restaurant in San Juan Bautista. Finally, in Molski v. Albertson's, Inc., C04-1984 (N.D. Cal. 2004), Molski again claims to have injured himself when negotiating architectural barriers at the Albertson's market in Morgan Hill, California.

And the day after that, May 23, 2003, Molski claims he was injured at five separate businesses that were separated from one another by a total distance of more than 140 miles, and which are 160 to 300 miles from his home in Woodland Hills. In Molski v. Cloninger Cellars, C04-1853 (N.D. Cal. 2004), Molski claims to have injured his upper extremities traversing rocks in a parking lot at the Cloninger Cellars winery in Gonzales. In Molski v. Toro Petroleum, C04-1941 (N.D. Cal. 2004), he claims to have injured his upper extremities transferring himself onto a toilet at the Gonzales Unocal 76 gas station in Gonzales. In Molski v. Roy's Drive-In, C04-1983 (N.D. Cal. 2004), he claims to have injured his shoulders transferring himself onto the toilet, and also when he wheeled off the sidewalk, at Roy's Drive-In restaurant in Salinas. In Molski v. Di Fronzo Properties, CV 04-3122 (C.D. Cal. 2004), he claims to have injured his upper extremities overcoming a two-to-three inch threshold at Zadok's Coffee House

in Pismo Beach. Finally, in Molski v. Cracked Crab Restaurant, CV 04-3544 (C.D. Cal 2004), Molski claims to have injured his upper extremities transferring himself onto a toilet at the Cracked Crab Restaurant in Pismo Beach.

In total, Molski filed 16 federal lawsuits for injuries purportedly sustained over this four-day period of time. Expanding that window slightly, the record reveals that Molski filed 26 lawsuits for injuries allegedly sustained between May 16 and May 23, 2003 - with Molski purportedly sustaining at least one injury on each day during that ten-day stretch. This period was far from an isolated incident. The Court's review of the complaints filed in 2004 alone reveals that on 37 separate occasions, Molski claimed to be injured twice or more on the same day. On 19 separate occasions, he claimed to be injured three or more times in one day. And on nine separate occasions, Molski filed four or more federal lawsuits for injuries allegedly sustained on the same day.

After filing the lawsuit, The Frankovich Group sends a copy of the complaint directly to each defendant, along with a letter, which can only be described as astonishing.[4] Describing itself as

---

[4] The Court has attached a copy of the letter sent to Kathy McInerney as an appendix to this order. When citing or quoting the letter, this order refers specifically to that letter. The record also contains the letters that The Frankovich Group sent to the other defendants in Mandarin Touch and Yang

"friendly advice," the letter counsels the unrepresented defendant against hiring his own lawyer. The letter claims that the "vast majority" of defense attorneys simply "embark on a 'billing' expedition" when hired, rather than looking out for their client's best interest. "Simply put," the letter continues, "defense attorneys want to sufficiently 'bill it' before they get realistic about the settlement." Accordingly, the letter states, the money required to retain a defense attorney "could be better spent on the remedial work and settlement of the action."

The letter further advises the defendants that their insurance policy may cover this claim, and goes on to describe, in considerable detail, what provisions of a general liability policy might provide coverage, including separate discussions of bodily injury, advertising, and wrongful eviction coverage. The Frankovich Group even offers to represent the defendants in a suit against their insurer, should the insurer refuse to provide coverage.

Finally, the letter advises the defendants that they do not "have any bona fide defense" to the lawsuit, and recommends that they quickly settle the matter, rather than "waste your money on needless litigation."

---

Chow. For all relevant purposes, the letters are identical.

SCANNED

II. Analysis

1. Sanctions

a. Inherent Power to Levy Sanctions

The District Court has the inherent power to levy sanctions in response to abusive litigation practices. See, e.g., Roadway Express, Inc. v. Piper, 447 U.S. 752, 765-66 (1980). It has long been recognized that this power includes the inherent authority to suspend or disbar lawyers. In re Snyder, 472 U.S. 634, 643 (1985)(citing Ex parte Burr, 9 Wheat. 529, 531 (1824)). This inherent power derives from the lawyer's role as an officer of the court which granted admission. Snyder, 472 U.S. at 643. "It is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion ought to reside in the Court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised." Ex parte Burr, 9 Wheat. at 530 (emphasis added).

Moreover, a district court has "the power and obligation to protect the public and efficient administration of justice" from vexatious litigation. In re Martin-Trigona, 737 F.2d 1254, 1262 (2d Cir. 1984). See also Peabody v. Schroll Trust, 892 F.2d 772, 777 (9th Cir. 1989) (recognizing that, in addition to its inherent power to sanction attorneys for reasons related to its own docket, a district court has "a

broader duty to the public, as well"); Standing Comm. on Discipline v. Ross, 735 F.2d 1168, 1170 (9th Cir. 1984) (stating that, in a disciplinary proceeding, "[t]he court must consider ... the need to protect the public from an unqualified or unscrupulous practitioner.").

In this case, the Court has taken into account several factors in determining whether it is necessary to exercise its inherent power to protect the public and the courts. Based on the litigation history of The Frankovich Group, including its history of giving unethical advice, making questionable allegations of physical injury, pursuing excessive compensatory damages, and securing quick settlements, the Court concludes that an exercise of its inherent power is appropriate.

b. Ethical Prohibition Against Advising Unrepresented Parties

It is unethical for a lawyer to offer advice to an unrepresented party whose interests actually or potentially conflict with the lawyer's client. A.B.A. Model Rule of Professional Conduct 4.3 (2003)[5] states, in relevant part: "The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel." Accord Model Code of Prof'l

[5] Pursuant to C.D. Cal. Local Rule 83-3.1.2, the Model Rules of Professional Conduct of the American Bar Association may be considered as guidance when disciplining attorneys.

Responsibility DR 7-104(A)(2) (stating that a lawyer shall not "[g]ive advice to a person who is not represented by a lawyer, other than the advice to secure counsel"). See also N. T. Grant Co. v. Haines, 531 F.2d 671, 676 n.3 (2d Cir. 1976) ("it is ... improper for one party's attorney to advise the unrepresented other party as to the course of conduct the attorney thinks the latter should pursue").

In the letter, The Frankovich Group violates this ethical rule in at least three ways. First, it advises an unrepresented party against obtaining counsel, when it may only advise the opposite. Second, it provides a considerable amount of legal advice on pursuing a claim against the defendant's insurance company. Third, it advises the unrepresented party that it does not "have any bona fide defense" to the lawsuit and recommends that it quickly settle the matter, rather than "waste [its] money on needless litigation."[6]

The first of these violations is particularly egregious. The Frankovich Group's act of advising an

[6] Although this Court has focused on three specific violations of the rule, the letter itself recognizes that it has actually given advice about seven different matters. See McInerney Letter at 5 ("We find all to [sic] often that many defendants are not properly advised as to their position in the litigation, insurance coverage issues, injunctive relief sought, damages, the tactics of insurance defense attorneys, attorneys' fees, and the use of an early mediation/settlement conference to resolve the matter."). As the Model Rules and relevant case law make clear, it is not the place of adverse counsel to advise an unrepresented defendant on these matters.

SCANNED

unrepresented party against retaining counsel is in direct conflict with the letter and spirit of the Rule. In the guise of what is described as "friendly advice," The Frankovich Group purports to expose the tactics of defense attorneys. According to the letter, "the vast majority" of defense attorneys, once retained, will simply "embark on a 'billing' exercise." "Simply put, the defense attorneys want to sufficiently 'bill it' before they get realistic about the settlement." The letter goes on to instruct defendants that, because defense attorneys are presumably more interested in lining their own pockets than looking out for their client's best interest, the money spent on a defense attorney "could be better spent on remedial work and settlement of the action."[7]

In addition, the legal advice regarding insurance coverage appears questionable at best. The letter suggests that various provisions of the defendants' insurance policy may provide coverage for Molski's lawsuit. However, the California Court of Appeals has held that there can be no insurance coverage for the

---

[7] There should be no doubt that advising a party against retaining counsel constitutes legal advice under the Rule. The Model Rules specifically state that an attorney "shall not give legal advice to an unrepresented person, other than the advice to secure counsel." ABA Model Rules of Prof'l Conduct 4.3 (emphasis added). Thus, by its very words, the Rule recognizes that a recommendation to secure counsel qualifies as advice. It necessarily follows that advising an unrepresented party against retaining counsel constitutes legal advice as well.

sort of ADA violations alleged. Modern Development Co. v. Navigators Ins. Co., 111 Cal. App. 4th 932, 941-43 (2d. Dist. 2003). Mr. Frankovich is unquestionably aware of this decision, because he challenged it and lost in the case of Frankovich v. Truck Insurance Exchange, 2003 Cal. App. Unpub. LEXIS 11714, at *11, 2003 WL 22965254, at *4 (Cal. App. 2d. Dist. 2003)(noting that "this court recently rejected Frankovich's precise argument in Modern Development Co. v. Navigators Ins. Co."). Moreover, the Truck Insurance case was decided six months before The Frankovich Group sent its letters to the Mandarin Touch Defendants. Thus, The Frankovich Group's advice is not only unethical, it is misleading as well.

These ethical violations are particularly significant because they all appear to be aimed at one goal: coercing a quick settlement. In essence, the letter urges a Defendant to make a quick and uninformed decision to settle. The decision to settle must be made quickly because the letter warns of "skyrocket[ing]" costs if the matter does not settle immediately. The decision is uninformed because the letter advises the party against retaining counsel. The advice regarding insurance coverage further buttresses this conclusion.

c. Questionable Allegations of Physical Injury

As discussed above, the Court reviewed 223 complaints filed by The Frankovich Group in 2004, and

found that each one contains some allegation of bodily injury. For the reasons discussed below, the Court believes that many of the claimed physical injuries are contrived in order to implicate the defendants' insurance policies.

First, the rate of physical injury defies common sense. In every complaint filed in 2004, Frankovich clients allege a physical injury. In 80% of the complaints, the plaintiff alleges an injury to his or her upper extremities. Additionally, clients such as Molski routinely make claims for multiple similar physical injuries that are purportedly sustained in different businesses on the same day. It is particularly troubling that many of these injuries are sustained in similar fashion, such as wheeling over uneven terrain, ascending or descending steps, or squeezing into a door which is too narrow. Common sense dictates that an individual who has encountered as many architectural barriers as Mr. Molski would know which barriers should be avoided, and which are unlikely to result in injury. It seems likely that, if Molski indeed injured himself repeatedly in nearly identical fashion, the injuries are not accidental as claimed, but instead are sustained intentionally so that a physical injury can be alleged as part of a subsequent lawsuit.

This conclusion does not excuse the existence of an architectural barrier, nor does it disparage Molski's

right of access at any public accommodation. It is merely a recognition of the fact that reasonable people, once injured, tend to take affirmative steps to avoid similar physical injuries, rather than repeat that same activity 400 times (or five times in the same day), even if the activity is one that they are unquestionably entitled to perform.

Second, the complaints uniformly allege physical injury, even when this claim appears to directly contradict the facts alleged. For example, in Molski v. Casa Medina, C04-1947 (N.D. Cal. 2004), Molski alleges that "as a legal result of defendants [sic] breach of duty to remove those barriers encountered by plaintiff, plaintiff suffered bodily injury." Complaint at ¶ 29 (emphasis added). Specifically, Molski's complaint alleges that he "suffered bodily injury (including, but not limited to, fatigue, stress, strain and pain in wheeling and attempting to and/or tranferring)" due to the defendants' failure to provide accessible facilities. Complaint at ¶ 30. However, according to the factual allegations in Molski's complaint, Molski never attempted to negotiate any barrier in the restaurant. His complaint identifies three barriers: First, he claims the restaurant lacked adequate directional signage to an accessible entrance. Second, he claims a flight of stairs prevented him from entering. Third, he claims that his significant other informed him the bathrooms were not accessible.

Clearly, Molski could not have been physically injured by a lack of signage, or by a bathroom that he never personally observed, let alone entered. Molski could have been physically injured had he attempted to climb the stairs, but according to his complaint, he made no attempt to do so. See id. at ¶ 23 ("At said time and place, plaintiff JAREK MOLSKI stared helplessly at the front stairs. The staircase was simply too high for plaintiff JAREK MOLSKI to attempt to crawl or be pulled up."). Since there is no way that Molski could have been physically injured by observing a staircase, and since the complaint's allegations foreclose any possibility that Molski was able to enter the establishment and encounter other barriers, the claim of physical injury appears to be contrived.

Just as in Casa Medina, in Molski v. Albertson's, Inc., C04-1984 (N.D. Cal. 2004), Molski claims that "as a legal result of defendants [sic] breach of duty to remove those barriers encountered by plaintiff, plaintiff suffered bodily injury." Complaint at ¶ 24. However, once again, the barriers that Molski encountered do not seem to be responsible for any physical injury that he alleges. Molski alleges an improper number of accessible parking spaces and a lack of adequate signage. As a result, he claims that he was forced to wait for a handicapped space to become available. Id. at ¶ 21. While waiting for an accessible parking space may be unpleasant, there is no

way that it could be responsible for the bodily injury alleged by Molski, which once again consisted of "fatigue, stress, strain and pain in wheeling and attempting to and/or transferring."[8] Id. at ¶ 26.

SCANNED

Based on the above, the Court believes that the plaintiffs contrived many of their allegations of bodily injury. The only logical reason to contrive minor injuries is to implicate the personal injury provisions of the defendant's insurance policy. As discussed above, The Frankovich Group encourages defendants to seek insurance coverage under, inter alia, the personal injury provisions of their general liability policy. The allegations of physical injury, which are not an essential element of a claim of discrimination under the ADA, thus appear to be included in the complaint to improve the chances of invoking insurance coverage as a source for the payment of damages.[9]

---

[8] Similar contradictions occur in complaints filed on behalf of other Frankovich Group clients. For example, in Jankey v. Mister D's Liquor Market, CV 04-9112 (C.D. Cal. 2004), Jankey was unable to access the sidewalk in front of a liquor store due to a lack of ramps or cut curbs. Jankey blew his horn, at which time an employee came out of the store and assisted him with his order. Complaint at ¶ 22. Jankey noted other violations before leaving without attempting to enter the store. Despite a lack of any physical contact with an architectural barrier, Jankey then makes an identical claim of bodily injury "including, but not limited to, fatigue, stress, strain and pain in wheeling and attempting to and/or transferring." Id. at ¶ 28.

[9] Further proof of canned allegations comes from a letter that The Frankovich Group sends to prospective clients, which outlines its litigation philosophy. See Ex. B to Declaration of

d. Damage Issues

In every complaint reviewed by this Court, clients of The Frankovich Group seek damages of $4,000/day for each day from the date of their visit to the date when repairs are completed. The Court's review of the complaints filed demonstrates that it is a regular practice of the Plaintiffs to wait up to one year before filing their claims, during which time the requested daily damages continue to accumulate.[10] In its Order Declaring Jarek Molski a Vexatious Litigant, the Court calculated that the damages requested totaled $1,452,000 by the time the Mandarin Touch case was filed. Such a damage claim can have an intimidating and coercive effect on a small business.

In response to the Order to Show Cause, Frankovich

---

Thomas E. Frankovich. The letter informs prospective clients that "[y]ou should also know that we use the terms 'emotional distress' and 'negligence as we prosecute your case. Although we use those terms, we do not file a cause of action based upon negligence, the negligent infliction of emotional distress, or the intentional infliction of emotional distress." The Frankovich Group made good on its pledge. In every case filed in 2004, Frankovich Group clients allege emotional distress and negligence without bringing a cause of action for negligence, or the negligent or intentional infliction of emotional distress. But how could The Frankovich Group have known this in advance? Surely it was likely that in (at least) one of the 223 cases, a client would be injured as the result of negligence, or not suffer emotional distress. That fact that 223 separate cases unfolded exactly as described in advance suggests that the identical allegations of emotional distress were contrived.

[10] The requested damages accumulate during this time despite a lack of any notice to the defendants, who presumably would have some interest in mitigating their liability by performing the repairs immediately.

ridicules the suggestion that Molski genuinely expects to collect that amount, asking, "how could any lawyer or this Court believe that Jarek Molski is seeking anywhere near this amount in damages?" Declaration of Thomas E. Frankovich at 35: 4-5. The Court's response is simply: Is the Court not to believe a request for damages made in a verified complaint? Frankovich's argument is further undercut because he specifically advises unrepresented parties not to obtain counsel, and in the same letter, refers them to the portion of the complaint where daily damages are requested. Thus, even if the Court makes the questionable assumption that no attorney could believe that Jarek Molski was actually seeking that amount in damages, an unrepresented party certainly could. In re Marriage of Foran, 67 Wn. App. 242, 254 (Wash. Ct. App. 1992)("That which is obvious to attorneys and judges may not be obvious to the unrepresented and economically subservient party.").[11]

e. Issues Involving Settlement

In its Order Declaring Jarek Molski a Vexatious

---

[11] Moreover, it is unclear whether the sort of daily damages requested are available under California law. California courts read a statute against permitting cumulative daily damages unless the statute specifically authorizes them. See Hale v. Morgan, 22 Cal. 3d 388, 401 (1978)("Uniformly, we have looked with disfavor on ever-mounting penalties and have narrowly construed the statutes which either require or permit them."). Neither the Unruh Act nor the CDPA specifically authorize daily damages, and thus, it is questionable whether such damages would be permissible under California law.

Litigant, the Court noted that the vast majority of Molski's claims settle. Despite the fact that he has filed approximately 400 lawsuits, Molski has apparently tried only one case on the merits, Molski v. Cable's Restaurant, CV 03-4809 (C.D. Cal. 2003).[12] The Court concluded that the unusual amount of settlements was indicative of an extortion scheme.

In response to the Order to Show Cause, Frankovich disputes this conclusion, arguing that the suits settle because the defendants lack any meritorious defense. While this certainly may be true in some cases, it misses several important points. First, even if a party had a meritorious defense, the cost of litigating the matter would likely exceed the cost of settling.[13] In such a circumstance, it would make little sense for a party to persist in its defense, even if meritorious. Second, even if innocent, parties may prefer to avoid the rigors of litigation - especially in a matter involving an allegation of intentional discrimination - and in such a circumstance, would be willing to settle

---

[12] On November 18, 2004, a jury, finding no violations of the ADA, unanimously ruled in favor of the Defendants.

[13] This is implicitly pointed out in the aforementioned letter which is sent to all defendants. The letter notes that if the matter does not settle quickly, the cost of litigation will "start[] to rise, or as some may say, skyrocket."

in order to "avoid litigation and buy their peace."[14] Finally, in the case of unrepresented parties, it does not take into account that it is The Frankovich Group itself that is advising the parties that they have no meritorious defense. The parties may believe that they have no meritorious defense based on the contents of The Frankovich Group's letter, but, if they accepted the letter's advice, they would not independently confirm the matter.[15]

Moreover, Courts have recognized that an unusual number of settlements can be evidence of an extortion scheme. In Reed v. Great Lakes Cos., 330 F.3d 931 (7th Cir. 2003), the district court imposed sanctions on Melvin Reed, who had worked for 25 different employers

[14] Such an understanding is even reflected in some of the settlement agreements which the Plaintiffs lodged with the Court. See, e.g., Declaration of Thomas E. Frankovich, Ex. 61 (Settlement Agreement for Molski v. Valencia Lanes, Inc., CV 03-5455 (C.D. Cal. 2003)) at ¶ 3("It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and that the payment made is not to be construed as an admission of liability on the part of Releasees, and each of them, and that said Releasees deny liability therefor and make settlement reflected herein merely to avoid litigation and buy their peace.") (emphasis added).

[15] There is no evidence that proves that the barriers alleged actually exist, and if they do, whether their removal would be "readily achievable." None of the 65 settlement agreements which the Plaintiffs submitted to the Court contains an admission of liability, and Molski lost the only case he ever took to trial (with the jury making a special verdict finding that no barriers existed). The Plaintiffs almost never need to prove their allegations of discrimination because considerable disincentives discourage defendants from litigating a matter on its merits.

over the previous 15 years, and filed 13 employment discrimination suits against them. The district court inferred that Reed was engaged in a pattern of extortion, working for an employer just long enough to obtain a pretext for a discrimination lawsuit, and imposed sanctions on him. The Seventh Circuit reversed the sanctions, noting that a lack of settlements belied any claim of extortion. Reed, 330 F.3d at 936 ("Were he engaged in extortion he would have dropped his suits in exchange for nuisance-suit settlements.").

The indicia of extortion described in that case - an unusually high rate of discrimination lawsuits combined with an unusually high rate of settlements - are present in this case. Although standing alone this would not be proof of extortion, when combined with the other evidence that The Frankovich Group has aggressively and unethically pursued cash settlements, the high rate of settlements indicates such a scheme.

f. Conclusions

This Court has an obligation and a duty to protect the public from an unscrupulous practitioner. The record before the Court establishes that The Frankovich Group has engaged in a pattern of unethical behavior designed ultimately to extort money from businesses and their insurers. The Court believes that the record before it is sufficiently egregious to justify the suspension, or even disbarment, of the lawyers constituting The Frankovich Group. Accordingly, the

Court has requested that the State Bar investigate the matter and consider disciplinary action if appropriate. In the meantime, the Court believes that the public can be adequately protected by a less restrictive and drastic measure: a pre-filing order that requires The Frankovich Group to seek leave of court before filing any new complaints under Title III of the Americans with Disabilities Act.

A pre-filing order is the least restrictive sanction that protects both the public and the courts. Some sort of pre-filing notice to the courts is necessary because of The Frankovich Group's history of filing lawsuits and then quickly settling the matter. If a court is not allowed to examine the complaint before it is served on the party, the matter may be settled and dismissed before the court has a chance to determine the issues of standing and jurisdiction discussed herein. Moreover, it is not sufficient merely to require Plaintiff Molski to seek leave of court before filing a complaint, because The Frankovich Group has demonstrated an ability to recruit additional serial plaintiffs who make nearly identical claims. Therefore, it is the order of the Court that The Frankovich Group, as presently constituted, and as it may hereafter be constituted, including all shareholders, associates and employees, is hereby required to file a motion requesting leave of court before filing any new complaints alleging violations of

Title III of the Americans with Disabilities Act in the United States District Court for the Central District of California. Such a motion must include a copy of this order.

2. Jurisdictional Issues

As the Court noted in its prior Order Declaring Jarek Molski a Vexatious Litigant, the Plaintiffs seek damage remedies under state law that are not available under federal law. Congress made a conscious choice to limit a private plaintiff's remedy under the ADA to injunctive relief. See, e.g., Adam A. Milani, Go Ahead. Make My 90 Days, 2001 Wis. L. Rev. 107, 115 (2001). While the Plaintiffs could seek all of the remedies they are seeking in state court, they bring these suits in federal court for a reason. The Court believes that one of the reasons is intimidation. The letters sent to the defendants in these cases (mostly small business owners) state prominently that these suits are brought in federal court. This fact may be intimidating to small business owners, and attorneys unaccustomed to practicing in the federal courts, and thus increases the likelihood of settlement. Another reason for bringing these suits in the federal court is the added inconvenience to parties who reside some distance from a federal courthouse, many of whom would be forced to retain new counsel or pay the travel expenses of their local counsel.

While the Plaintiffs can choose the forum in which

they bring a suit consistent with the principles of concurrent and pendant jurisdiction, the exclusive federal remedy allowed by Congress for suits brought under the ADA raises a number of jurisdictional concerns.

a. Standing

Following the February 7, 2005 hearing, the Court issued an Order to Show Cause why the individual Plaintiffs' federal claims should not be dismissed for lack of standing because the Court found there were substantial questions regarding the standing of the individual Plaintiffs in these cases to seek injunctions under the ADA.

Prior to that hearing, the Court ordered Plaintiff DREES to show cause why its claims should not be dismissed for lack of standing. An organization may have standing to sue on behalf of its members if (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) the participation of individual members in the lawsuit is not required. Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). DREES asserts the same claims as the individual Plaintiffs; it would clearly not have standing if the individual Plaintiffs did not have standing. And even if the individual Plaintiffs did have standing, DREES does not have standing in these cases. The third requirement for

organizational standing is not met for the following reason: the individual Plaintiffs' participation is required in these cases, because they must present evidence to establish their own standing. See Disabled In Action of Metropolitan New York v. Trump Int'l Hotel & Tower, No. 01 Civ. 5518, 2003 U.S. Dist. LEXIS 5145, at *32-33, 2003 WL 1751785, at *10 (S.D.N.Y. April 2, 2003) (dismissing organizational plaintiff for lack of standing on this ground).

Moreover, beyond the standing requirements mentioned above, other prudential standing doctrines suggest that DREES lacks standing in these cases, including the "general prohibition on a litigant's raising another person's legal rights," Allen v. Wright, 468 U.S. 737, 751 (1984), and that courts "limit access to the federal courts to those litigants best suited to assert a particular claim," Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979). See Access 123, Inc. v. Markey's Lobster Pool, Inc., No. Civ. 00-382-JD, 2001 U.S. Dist. LEXIS 12036, at *9-12, 2001 WL 920051, at *4 (D.N.H. Aug. 14, 2001) (dismissing organizational plaintiff for lack of standing on these grounds). In the cases currently before the Court, DREES merely repeats the claims brought by the individual Plaintiffs. The Court believes that DREES is added as a plaintiff to lend an aura of legitimacy to this predatory litigation as part of the strategy to encourage settlement. However, the

individual Plaintiffs appear to be the better parties to assert their own claims. For all of these reasons, the Court concludes that DREES lacks standing in these cases. Accordingly, this Court has dismissed DREES's claims under the ADA.

b. Subject Matter Jurisdiction

The Court ordered the Plaintiffs to show cause why their federal claims should not be dismissed for lack of subject matter jurisdiction as sham complaints, brought as a pretext to gain access to the federal courts. The Supreme Court has held that "a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." Bell v. Hood, 327 U.S. 678, 682-83 (1946). While the Court believes the ADA claim is asserted for the purpose of obtaining federal jurisdiction, the Court cannot conclude that the ADA claim is clearly immaterial or wholly insubstantial. The ADA claim is an element of the state law claims and therefore is not immaterial to the state law claims asserted. Thus, the court would have jurisdiction over the ADA claim. That the ADA claim is an element of the state law claims, however, does not mean that there is independent federal jurisdiction for the state law claims. Wander v. Kaus, 304 F.3d 856, 859 (9th Cir. 2002).

There are compelling reasons for declining to exercise supplemental jurisdiction over these state law claims, which seek remedies that Congress clearly intended to preclude under the ADA. "[P]endant jurisdiction is a doctrine of discretion, not of plaintiff's right." City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172 (1997). Federal courts may decline to exercise supplemental jurisdiction over claims in the following circumstances:

> (1) if the claim raises a novel or complex issue of state law, (2) if the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) if the district court has dismissed all claims over which it has original jurisdiction, or (4) if in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367 (c). The language of the statute is disjunctive, meaning that any one of the four reasons would be sufficient to decline to exercise jurisdiction. At least two of these reasons apply in this case.

First, the state law claims raise novel and complex issues of state law. The state statutes under which the Plaintiffs sue for damages have not been widely interpreted. For example, there is no definitive decision from the California courts with regard to daily damages. Federal courts have disagreed on the subject, which has created unnecessary confusion. Compare Botosan v. Fitzhugh, 13 F. Supp. 2d 1047 (S.D. Cal. 1998)(permitting recovery of daily damages) with

SCANNED

Doran v. Embassy Suites Hotel, No. C02-1961, 2002 U.S. Dist. LEXIS 16116, at *12-17, 2002 WL 1968166, at *4-6 (N.D. Cal. 2002)(finding daily damages are not authorized by statute and criticizing the holding in Botosan). Ultimately, this is a matter of state law, which is better left to the California courts. United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)("Needless decisions of state law should be avoided as a matter of comity.").

The Court also believes that there is a question regarding the applicability of California Proposition 64 to the Plaintiffs' Fifth Causes of Action for alleged violations of California's unfair business practices law. Proposition 64, approved by California voters in November 2004, limited the standing of plaintiffs to sue under that law. Proposition 64 eliminated the provision of California Business and Professional Code § 17204 authorizing initiation of a complaint by "any person acting for the interests of itself, its members, or the general public," and substituted a provision for enforcement only by "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition." Proposition 64 also amended section 17203, concerning injunctive relief under the unfair business practices law, to provide that a private person "may pursue representative claims or relief on behalf of others only if the claimant meets the

SCANNED

standing requirements of Section 17203 [i.e., actual injury] and complies with Section 382 of the Code of Civil Procedure" governing class actions. The meaning and scope of Proposition 64 are being hotly contested in the California state courts at this time. Compare Californians for Disability Rights v. Mervyn's, LLC, 24 Cal. Rptr. 3d 301 (Cal. App. 1 Dist. 2005) (declining to apply Propositon 64 retroactively) with Benson v. Kwikset Corp., __ Cal. Rptr. 3d __ (Cal. App. 4 Dist. 2005) (applying Proposition 64 retroactively). Accordingly, the Court believes that the state courts are the proper forum for the resolution of this novel issue of state law.

Second, the state law claims "substantially predominate" in terms of "the comprehensiveness of the remedy sought." Gibbs, 383 U.S. at 726. All but one of the claims sought by the Plaintiffs are state law claims. The state law claims allow for injunctive relief as well as damages, allowed only under state law. As the Court has previously noted, damages are central to the Plaintiffs' litigation strategy of seeking cash settlements. The Court is convinced that the state law claims substantially predominate over the federal claim and that the Plaintiffs have asserted the federal claim for the purpose of bringing the suit in federal court.

Finally, the Court must consider whether declining to exercise jurisdiction serves the principles of

economy, convenience, fairness and comity. Int'l College of Surgeons, 522 U.S. at 172-73. Although principles of economy and convenience may not be fully served if the federal claim remains, the principle of comity strongly favors dismissing the state law claims. See Executive Software N. Am., Inc. v. United States Court for the Central District of Cal., 24 F.3d 1545, 1553 (9th Cir. 1994) ("When novel issues of state law are presented, though, considerations of judicial economy are not determinative.") (quoting Gingerich v. White Pigeon Community Schs., 736 F. Supp. 147, 149-51 (W.D. Mich. 1990)). Therefore, the Court believes that declining supplemental jurisdiction over the state law claims in these cases is appropriate. Accordingly, the Court has dismissed the Plaintiffs' state law claims.

III. Conclusions

The record before the Court demonstrates that the Plaintiffs and their attorneys have participated in a pattern of abusive litigation, bordering on extortionate shysterism. The damage is not limited, however, to the businesses and insurers who are the direct victims of this scheme. The integrity of the bar is called into question by the well-publicized accounts of lawyers employing unethical tactics in the pursuit of their own financial gain. The legitimacy of the courts is also injured because the public may view the courts as complicit in allowing these shakedown schemes to continue. Most importantly, this type of

litigation creates a backlash against disabled persons who rely on the ADA as a means of achieving equal access.

In such a circumstance, the Court has an obligation to protect both the public and the judicial system. By requiring the architects of the scheme to seek leave of court before filing any similar complaints, the Court has employed the least restrictive measure available that achieves this goal. Further, the Court has concluded that DREES lacks organizational standing to pursue a claim under the ADA, and accordingly has dismissed its ADA causes of action. Finally, the Court has concluded that the state law claims predominate, and that the complex issues of state law are best left to the California courts. Accordingly, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' state law claims.

Despite these conclusions, the Court understands and sympathizes with the frustration that disabled individuals feel whenever they encounter an architectural barrier that limits their right of access. The Court encourages such persons to seek federal court remedies under the ADA.

SCANNED

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by United States mail or by telefax or by email, copies of this Order on counsel for the parties in this matter.

Dated: MAR 8 2005

EDWARD RAFEEDIE
Senior United States District Judge

SCANNED

Appendix

THE FRANKOVICH GROUP*
LAWYERS

2806 Van Ness Avenue - San Francisco, CA 94109-1426
Phone: 415-674-8600 • Facsimile: 415-674-9900 • TDD: 415-441-8100

SCANNED

June 18, 2004

Kathy McInerney
538 Miramonte Drive
Santa Barbara, CA 93109

Re: *Molski v. Mandarin Touch*
USDC C.D. Ca Case No.CV 04-0450 ER (SHx)
Our Reference: Mandarin Touch
Subject: Discrimination by Failure to Remove Architectural Barriers

Dear Ms.McInerney:

You are being served with a Summons and Complaint for failure to remove architectural barriers as required under state discrimination statutes and/or under the Americans with Disabilities Act of 1990. The failure to remove barriers deprived our client of the full use, enjoyment of goods, services and opportunities of your public accommodation.

Please read the "Factual Allegations" section of the Complaint. That section sets forth the major architectural barriers about which our client and the disability community are most concerned. This will allow you to quickly assess the barriers and determine the cost of the remedial work sought.

We believe the following architectural barriers could be addressed/removed within ninety (90) days:

1. reconfigure the register area and seat near the restrooms to provide for additional space for a restroom remodel;

2. with a reconfiguration of the register area combine the men's and women's restroom into a unisex handicapped accessible restroom.

The concept of barrier removal is probably clear to you. The details of barrier removal are probably unclear to you. We are more than willing to do a walk-through with you and suggest solutions

Thomas E. Frankovich, A Professional Law Corporation
Accessible Accommodations and Parking at One Daniel Burnham Court, San Francisco, CA
or at Your Home
BY APPOINTMENT ONLY AT ALL LOCATIONS

Once you have retained counsel, we will not be able to communicate with you directly. That is why we are taking this opportunity to discuss our position on this action and to call attention to certain issues that you should be aware of:

1. This action is filed in the Federal District Court.

2. The action seeks:
   - Injunctive Relief
   - Compensatory Damages
   - Attorneys' fees and costs

3. Injunctive Relief: Plaintiff seeks an order from this court to issue a mandatory injunction compelling you to make the subject public accommodation accessible as set forth in the Complaint.

4. Compensatory Damages: Monetary damages (money) are sought on behalf of the plaintiff for the damages suffered as a result of the acts of discrimination. This is a state cause of action

5. Attorneys' fees, costs and litigation expenses are provided both under state and federal law. If the plaintiff prevails, these costs and litigation expenses will be awarded against you.

6. Insurance Coverage: Insurance may be available to you for this claim. CAVEAT/BEWARE:

   i. Your insurance company may deny coverage.

   ii. Your insurance company may defend you under a "Reservation of Rights." That means your insurance company will provide a defense for you (hire attorneys on your behalf) but reserve the issue as to whether they are obligated to pay the claim.

   iii. If you have a general liability policy, coverage may be extended to you under the following provisions: bodily injury coverage; advertising coverage; and/or wrongful eviction coverage. *

SCANNED

- Bodily Injury Coverage: Bodily injury coverage is generally extended to claims that pertain to "bodily injury" and emotional distress if there is a direct relationship to bodily injury.

- Advertising Coverage: Advertising coverage may be extended if you advertised that your public accommodation was accessible which resulted in bodily injury, property damage or damages. Examples of advertising, publicizing or representing that the public accommodation was accessible would be displaying the international disability symbol, advertising that the public accommodation is accessible, representations by employees stating that the public accommodation is wheelchair accessible, usable by persons with disabilities, can accommodate a person with disabilities, or the like.

- Wrongful Eviction Coverage: Wrongful eviction coverage is normally extended for the hotel/motel/resort industry where a disabled person is forced/compelled to leave a guest room because it is not accessible. The theory is that this constitutes an "actual eviction." Another "theory" for coverage is "constructive" eviction. For example, if a room is available but not accessible, this may constitute constructive eviction as it would be a "futile gesture" for a person with disabilities to attempt to secure the guest room.

*These are theories and you should consult your coverage counsel to discuss their application, validity and usefulness.

iv. Insurance may or may not cover attorneys' fees and costs that you may be ordered to pay. Too often defendants believe, or are led to believe, that their insurance companies will pay the plaintiff's attorneys' fees. You must determine what your insurance actually provides. Ultimately, you will be responsible for paying our fees, should we prevail. Therefore, the issue of coverage

SCANNED

SCANNED

should be of utmost concern to you. Simply put, if you receive a "Reservation of Rights" letter, you may still be financially responsible to pay compensatory damages and plaintiff's attorneys' fees and costs. We urge you in this instance, to seek independent counsel, and not rely upon insurance defense attorneys, to determine your rights and your exposure.

7. Defense Billing: Once defense attorneys respond to or answer the Complaint, the vast majority, rather than attempt to settle the action, embark on a "billing" exercise. Simply put, the defense attorneys want to sufficiently "bill it" before they get realistic about the settlement. This may cost you a significant amount of money that could be better spent on the remedial work and settlement of the action. Keep in mind, the more work your attorneys force on us, the more work we must do. The more work we do is just that much more money you may be responsible for paying.

We do not believe you have any bona fide defense to your continuing obligation to identify and remove architectural barriers pursuant to the ADA, which was passed over a decade ago, (14 years). We do not want to see you waste your money on needless litigation. We want access agreed to now, not later. In essence, we are making a demand that you enter into a Mutual Settlement Agreement and Release for the removal of all of the architectural barriers raised in the complaint to completely resolve this aspect of the case. This will accomplish two things -- first, it will provide full access which is positive; and second, it will significantly reduce attorneys' fees for all parties. Keep in mind that all remedial work necessary to remove barriers at Mandarin Touch can be resolved in a settlement agreement by setting forth a reasonable time line. This will give you financial flexibility in your planning.

You may contact us for the agreement before you retain counsel to explore resolution of this action. Otherwise, we will forward a copy to your counsel when you become represented.

Once you have committed or can assure us, in writing, that the remedial work will in fact be undertaken, you may have your attorneys contact us to resolve all aspects of the action now. That can occur through a direct negotiation with your attorneys or through a court-supervised mediation/settlement conference.

If you do not follow our suggestions or requests, which is your choice, we understand. We can then rest assured that you received our message on how this case could

SCANNED

efficiently and cost effectively be resolved at this stage in the litigation. It will also serve as a reminder to you later in the litigation that we gave you the earliest opportunity to settle the action before the cost of litigation started to rise, or as some may say, skyrocket.

We hope you accept this letter as friendly advice. We find all to often that many defendants are not properly advised as to their position in the litigation, insurance coverage issues, injunctive relief sought, damages, the tactics of insurance defense attorneys, attorneys' fees, and the use of an early mediation/settlement conference to resolve the matter.

Returning to the issue of full insurance coverage, if in fact you are denied coverage (money) to pay any part of the claim which is monetary in nature, this office at the conclusion of the litigation would consider discussing with you the merits of a "bad faith" case against your insurance carrier. You should keep this in mind and discuss it with your own private counsel, not counsel hired by the insurance company.

Defendants that do not consider an early settlement eventually face the hard reality that the remedial work will have to be done, compensatory damages paid and that attorneys' fees and costs have risen substantially. That is why we have taken this opportunity to explain to you our position so you can make a sound decision as to the course you wish to take -- that being either to consider early settlement discussions or to litigate the matter. If you wish to entertain settlement now, you may contact us directly unless you have retained counsel. In that event, you may have your attorneys contact us. I remain,

Very truly yours,

Thomas E. Frankovich
DICTATED BUT NOT READ IN THE INTEREST OF TIME

TEF/amc

2:04-CV-00450

Date Transmitted:

3/8/2005 1:50:51

Robert H Appert
Robert H Appert Law Offices
1208 S San Gabriel Blvd
San Gabriel, CA    91776

Number of Pages:        40

It is hereby certified that this document was served by first
class mail postage prepaid or by fax or e-mail delivery to
counsel (or parties) at their respective address or fax
number or e-mail address of record.